IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AIR PRODUCTS AND CHEMICALS, : 
INC., :
 :
               Plaintiff, :        CIVIL ACTION NO. 18-4878
 :
    v. :
 :
THE PROCTER AND GAMBLE : 
MANUFACTURING COMPANY, :
 :
             Defendant. :

## **MEMORANDUM OPINION**

Smith, J.                                                                              September 30, 2019

The parties in this case contracted to have the plaintiff design, install, and maintain a hydrogen compression, storage and dispensing system at the defendant's Louisiana facility. Tragically, an employee of the defendant was operating a hydrogen-powered lift truck at the Louisiana facility when it exploded, killing the employee and injuring three other employees. The injured employees and other representatives have now sued multiple defendants, including the plaintiff, in a Louisiana state court. This matter is now proceeding through discovery, with the defendant having intervened in the action.

The plaintiff brings the instant action to have the court determine that the defendant must defend it in the Louisiana action pursuant to a duty to defend provision in the parties' written agreement. The plaintiff also seeks compensation for its legal fees and costs that it has expended thus far to defend itself in the Louisiana action.

The parties have cross moved for summary judgment on whether the written agreement obligates the defendant to defend the plaintiff in the Louisiana action. For the reasons set forth below, the court finds that the parties' agreement clearly and unambiguously provides that the

defendant shall defend the plaintiff in the Louisiana action where the allegations arise from or are in connection with the plaintiff's performance of the parties' agreement. Accordingly, the court will grant the plaintiff's motion for summary judgment, deny the defendant's cross-motion for summary judgment, and direct that the defendant defend the plaintiff in the Louisiana action. Additionally, as the parties' agreement only permits the recovery of reasonable legal fees, costs, and expenses, the court will also require the plaintiff to submit an itemized list of its fees, costs, and expenses defending the Louisiana action so far and will give the defendant an opportunity to object to those fees, costs, and expenses that it believes are unreasonable.

## I.      PROCEDURAL HISTORY

The plaintiff, Air Products and Chemicals, Inc. ("Air Products"), commenced this action by filing a complaint against the defendant, The Procter and Gamble Manufacturing Company ("P&G"), on November 13, 2018. Doc. No. 1. In the complaint, Air Products alleges that a tragic incident occurred in May 2018, wherein one P&G employee died, and three other P&G employees were injured, when a hydrogen-powered forklift exploded at a P&G plant in Pineville, Louisiana. *See* Compl. at ¶ 23, Doc. No. 1. At the time of the incident, P&G and Air Products were acting under an agreement through which Air Products, *inter alia*, provided P&G with gaseous hydrogen for P&G to use with its "hydrogen fueling activities for fuel cells for lift trucks" at P&G's Pineville, Louisiana facility. *Id.* at ¶¶ 1, 13, 14. In addition, pursuant to the agreement, Air Products "selected, installed, and maintains certain hydrogen fueling equipment . . . at P&G's facility including, among other things, a compression, storage, and dispensing system." *Id.* at ¶ 15.

The injured employees, the injured employees' family members, and the deceased employee's representatives filed a "Petition for Damages" in the 9th Judicial District in the State of Louisiana (the "Lott Matter"). *See id.* at ¶ 27. This petition named Air Products as a defendant

and asserted five causes of action against it. *See id.* The causes of action relate to the hydrogen compression, storage, and dispensing equipment at the Pineville facility. *See id.* at ¶ 31.

After receiving notice of the "Petition for Damages," Air Products tendered the Lott Matter to P&G so it could indemnify, defend, and hold harmless Air Products pursuant to sections 9(a) and 9(d) of the parties' agreement. *See id.* at ¶¶ 18–20, 34. P&G has declined Air Products' tender of indemnification and defense in the Lott Matter. *See id.* at ¶ 35. As a result, Air Products has retained its own counsel and has incurred fees and costs to date in defending the Lott Matter. *See id.* at ¶ 36.

Air Products now asserts that P&G breached section 9 of the parties' agreement when it "refus[ed] Air Products['] tender of the defense of the Lott Matter.]" *Id.* at ¶ 43. Air Products seeks to have the court enter judgment in its favor and award it actual and compensatory damages arising from P&G's breach of the parties' agreement. *Id.* at 8.

P&G filed an answer and affirmative defenses to the complaint on December 18, 2018. Doc. No. 4. Shortly after answering the complaint, P&G moved to disqualify Air Products' counsel. Doc. No. 8. Air Products filed a response to the motion to disqualify on January 8, 2019, and P&G filed a reply to this response on January 15, 2019. Doc. Nos. 11, 12.

The undersigned held an initial pretrial conference with counsel on January 24, 2019, and held a follow-up telephone conference on February 1, 2019. During the telephone conference, the parties agreed that the court could deny the motion to disqualify. The court and the parties also discussed a schedule for the filing of motions for summary judgment. As such, the court entered an order on that same date which, *inter alia*, denied the motion to disqualify as moot and set a schedule for the filing and briefing of a motion for summary judgment. Order, Doc. No. 18.

The parties jointly requested that the court modify this scheduling order to permit P&G to also file a motion for summary judgment, and the court entered an order to this effect on February 22, 2019. Order, Doc. No. 20. On the same date, the parties filed their joint stipulation of material facts and Air Products filed its motion for summary judgment. Doc. Nos. 19, 21. P&G filed its cross-motion for summary judgment and opposition to Air Products' motion for summary judgment on March 15, 2019. Doc. No. 25.

The court entered an order on March 19, 2019, again modifying the briefing schedule at the parties' request. Order, Doc. No. 26. Air Products filed a response in opposition to P&G's motion for summary judgment and a reply to P&G's response in opposition to Air Products' motion on March 29, 2019. Doc. No. 27. P&G filed a reply to Air Products' response in opposition to its motion and a sur-reply to Air Products' reply brief on April 2, 2019. Doc. No. 28. Air Products then filed a sur-reply brief in opposition to P&G's motion for summary judgment. Doc. No. 29.

On April 11, 2019, the court heard oral argument on the cross-motions for summary judgment. After a telephone conference with the undersigned on May 2, 2019, the parties filed a supplemental stipulation of material facts. Doc. No. 34. The cross-motions are now ripe for disposition.

## II.    DISCUSSION

### A.    <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252.

Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238,

252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments included in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take

those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The summary judgment standard is the same even when, as here, the parties have filed cross-motions for summary judgment. *Erbe v. Conn. Gen. Life Ins. Co.*, Civ. A. No. 06-113, 2009 WL 605836, at *1 (W.D. Pa. Mar. 9, 2009) (citing *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006)). "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Transguard*, 464 F. Supp. 2d at 430).

## B.     Applicable Factual Record

### 1.     The Parties' Agreement

Air Products and P&G entered into a Hydrogen Supply Agreement on March 20, 2012 (the "Agreement"), with the parties subsequently amending the Agreement, effective December 19, 2013. *See* Stipulation of Material Facts ("Stip.") at ¶ 1 and Ex. A ("Agreement"). The initial term of the Agreement commenced on March 20, 2012, and it would run for ten years from the "date of commissioning the Equipment."[1] Agreement at 1; Stip. at ¶ 2.

The Agreement required Air Products to sell to P&G, and for P&G to purchase from Air Products, P&G's "entire purchase requirements of gaseous hydrogen . . . for [P&G's] activities with respect to its hydrogen fueling activities for fuel cells for lift trucks . . . carried out at [P&G's] Facility" located in Pineville, Louisiana. Agreement at 1. The Agreement stated that P&G "shall not permit (i) anyone other than its properly trained employees or invitees to carry out any hydrogen fueling activities using the Hydrogen provided hereunder and (ii) any vehicles other than

---

[1] According to Air Products, June 4, 2012, was the "date of commissioning the Equipment." Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 3, Doc. No. 21-2.

those owned by [P&G] or its invitees to be fueled with such Hydrogen." *Id.* The Agreement also obligated Air Products to perform regular preventative maintenance on the equipment and provided that Air Products would perform any major maintenance at P&G's expense. *Id.* at 2. The Agreement further required Air Products to install equipment at the P&G facility that Air Products deemed appropriate to supply P&G's hydrogen requirements. *Id.* The parties have agreed that "the equipment comprising a system for hydrogen storage, dispensing and compression in use at P&G's Facility was the equipment installed by Air Products pursuant to the Agreement."[2] Suppl. Stip. of Material Facts at ¶ 1, Doc. No. 34.

An attachment to the Agreement specifically identifies the equipment that Air Products would install, including (1) a hydrogen fuel station, including a gaseous hydrogen compressor system and storage vessels, (2) a gaseous hydrogen supply station, and (3) a liquid hydrogen supply system. Agreement, Attachment 2 at ECF p. 11. This attachment also indicates that "Air Products will design the equipment within their scope of supply to the following specifications and standard[,]" and then sets forth specifications relating to the "Hydrogen Demand," "Hydrogen Supply," "Hydrogen Compression System," "Dispensing and Vehicle Interface Requirements," and "Storage." *Id.* at ECF pp. 11–13. The attachment further discusses "DELIVERABLE AND DESIGN SERVICES," which "lists the complete scope of documentation deliverables and design services that [Air Products] will provide to [P&G] for the equipment items within Air Products' scope of supply." *Id.* at ECF p. 14. These "documentation deliverables and design services" include aspects relating to "General Design," "Civil/Structural," "Piping Design," "Instrumentation and Electrical Design," "Utilities Distribution System Design (Within Battery Limits)," and "Miscellaneous Activities." *Id.* at ECF pp. 14–17.

---

[2] Pursuant to the Agreement, Air Products retained title to the hydrogen compression, storage and dispensing system at issue. Agreement at 2.

The Agreement contains provisions to limit each party's liability and require the indemnity and defense of certain identified claims. *Id.* at 5–6. The pertinent provisions relating to defense and indemnification are as follows:

(a) **Duty to Warn; Indemnity.** [P&G] acknowledges that there are hazards associated with the use of the Hydrogen, that it understands such hazards and that it is [P&G's] responsibility to warn and protect its employees and others exposed to such hazards through [P&G's] storage and use of Hydrogen. Air Products shall provide [P&G] with copies of material safety data sheets relating to the Hydrogen to help [P&G] make such warnings, and [P&G] assumes all risk and liability for any loss, damage or injury to persons or property of third persons not within an Indemnitor's Group (defined below) arising out of the presence or use of the Hydrogen and shall indemnify, defend and hold harmless Air Products from any such loss, damage, injury, cost and expense (including reasonable legal fees) related thereto.

. . .

(d) **Indemnity of [P&G] and Air Products.** Each party (an "Indemnitor") shall defend, indemnify and hold harmless the other party (the "Indemnitee") for all claims, damages, expenses, losses, costs or liabilities, including without limitation reasonable legal costs, fees and expenses (collectively, "Losses"), arising out of (1) bodily injuries, including without limitation fatal injury or disease, to the Indemnitor's Group (as defined below) or (2) damage to tangible real or personal property of Indemnitor and Indemnitor's Group, in either case arising from or in connection with the performance of this Agreement. THE OBLIGATION TO INDEMNIFY, DEFEND AND HOLD HARMLESS SHALL APPLY WITHOUT REGARD TO FAULT OR CAUSE OF THE LOSSES, INCLUDING WITHOUT LIMITATION THE NEGLIGENCE OR STRICT LIABILITY OF THE INDEMNITEE. **"Indemnitor's Group"** shall mean: (i) collectively, with respect to Air Products, Air Products and its affiliates and subsidiaries, and any employee, officer, director or agent of any of the foregoing; and (ii) collectively, with respect to [P&G], [P&G] and its affiliates and subsidiaries, and any employee, officer, director, agent or invitee of any of the foregoing.

*Id.* at 5–6.

The Agreement is "governed by and construed according to the laws of the Commonwealth of Pennsylvania without giving effect to its conflicts of laws provisions." *Id.* at 7. Regarding dispute resolution, the Agreement states as follows:

> Any dispute between the parties relating to this Agreement that cannot be resolved with reasonable promptness shall be referred to each party's senior manager in an effort to obtain prompt resolution. Neither party shall commence any action against the other until the expiration of sixty (60) days from the date of referral to such senior managers; *provided however*, this shall not preclude a party from instituting an action seeking injunctive relief to prevent irreparable damage to such party.

*Id.*

## 2.    The Lott Matter

On August 28, 2018, Constance "Anne" Lott, Allegra Kendrick, Austin Kendrick, Charles Bailey, Jennifer Bailey, Vernon Meeks, Mikel Gray, and Jasmine Gray, filed a "Petition for Damages" in the 9th Judicial District Court in the Parish of Rapides, Louisiana. *See* Stip. at ¶¶ 3, 12 and Exs. B ("Pet. for Damages"), J. The petition identifies numerous defendants, including Air Products.[3] Pet. for Damages at 1–2.

According to the allegations in the petition, on or about May 24, 2018, William Kendrick was working as an employee at P&G's facility in Pineville, Louisiana. *See id.* at 3. He was operating a lift truck when it suddenly exploded. *See id.* A hydrogen fuel cell power unit powered the lift truck, and the fuel cell "contained a hydrogen fuel tank known as a composite overwrapped pressure vessel." *Id.* at 4. Air Products "designed, researched, developed, tested, inspected, produced, manufactured, analyzed, merchandised, packaged, advertised, promoted, labeled, distributed, marketed, sold, maintained, and placed into the stream of commerce [the hydrogen compression, storage and dispensing system at the P&G facility.]" *Id.* The explosion killed Mr.

---

[3] "P&G is not named in [this action], but has recently intervened as a party to preserve its rights to seek contribution for Workers Compensation payments made." Mem. of Law in Supp. of Def.'s Cross-Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mem.") at 2, Doc. No. 25-1.

Kendrick and caused the other plaintiffs, Charles Bailey, Vernon Meeks, and Mikel Gray, who were also P&G employees working near the forklift, to suffer serious bodily injuries. *See id.* at 3; *see also* Stip. at ¶ 5 ("The Petition alleges claims relating to injuries suffered by P&G employees William Kendrick, Charles Bailey, Vernon Meeks and Mikel Gray in a fork lift explosion on the floor of P&G's facility in Pineville, Louisiana.").

The Lott Matter plaintiffs assert multiple causes of action against Air Products. *See id.* at 17–21. Those causes of action include: (1) "Defect in Construction and/or Composition Under LA R.S. 9:2800.55;"[4] (2) "Design Defect Under LSA-R.S. 9:2800.56;"[5] (3) "Inadequate Warning under LA R.S. 9:2800.57;"[6] (4) "Breach of Express Warranty under La R.S. 9:2800.58;"[7] and (5) negligence.[8] *See id.* The plaintiffs seek monetary damages from all defendants, including Air Products. *See id.* at 25–28.

Air Products filed an answer and affirmative defenses to the petition. *See* Stip. at ¶ 4 and Ex. C ("Answer and Affirmative Defenses"). In its affirmative defenses, Air Products avers, *inter alia*, (1) it did not manufacture any product that caused the plaintiffs' injuries, and (2) it supplied hydrogen for use with P&G's fueling activities for fuel cells for lift trucks. Answer and Affirmative

---

[4] The plaintiffs allege that, *inter alia*, Air Products "designed, researched, developed, tested, inspected, produced, manufactured, analyzed, merchandised, packaged, advertised, promoted, labeled, distributed, marketed, sold and placed into the stream of commerce the hydrogen compression, storage and dispensing system in a condition which rendered the product unreasonabl[y] dangerous." Pet. for Damages at ¶ 142.

[5] The plaintiffs allege that, *inter alia*, Air Products was responsible for "designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and selling the hydrogen compression, storage and dispensing system," and the "hydrogen compression, storage and dispensing system is defective in its design or formulation." Pet. for Damages at ¶¶ 147, 149.

[6] The plaintiffs assert that, *inter alia*, the "hydrogen compression, storage and dispensing system designed, researched, developed, tested, inspected, produced, manufactured, analyzed, merchandised, packaged, advertised, promoted, labeled, distributed, marketed, sold, and placed into the stream of commerce by Air Products was defective due to inadequate warning or instruction." Pet. for Damages at ¶ 156.

[7] The plaintiffs alleged that, *inter alia*, Air Products "designed, researched, developed, tested, inspected, produced, manufactured, analyzed, merchandised, packaged, advertised, promoted, labeled, distributed, marketed, sold, and placed into the stream of commerce the hydrogen compression, storage and dispensing system." Pet. for Damages at ¶ 161. They further allege that Air Products "warranted to all foreseeable users and/or others, including Plaintiffs, that the hydrogen compression, storage and dispensing system was safe and effective for its intended purpose." *Id.*

[8] The plaintiffs' allegations specifically pertaining to negligence relate to the "hydrogen compression, storage and dispensing system." Pet. for Damages at ¶ 173.

Defenses at 1. In the answer, Air Products admitted "that it installed a hydrogen compression, storage and dispensing system at the P&G facility." *Id.* at 7.

### 3. Communication Between Air Products and P&G about Indemnification and Defense

In a July 3, 2018 e-mail from Wesley J. Gralapp, Esquire to, among others, Thuy Taitt, Esquire of Air Products, he placed "all third parties on notice of the claims being made by Charles Bailey, Mikely Gray and Vernon Meeks and [his] representation of them." Stip. at ¶ 6 and Ex. D ("Gralapp Ltr."). Attorney Gralapp also indicated that his firm was "not representing these individuals in a worker's compensation claim nor a tort claim against their employer, P&G." *Id.* He further stated that "[w]e have no intention of slowing the process to transport and test the forklift but would like to be considered and notified of all testing with the right to have someone present to participate and observe." *Id.*

Attorney Taitt sent a letter dated July 10, 2018 to P&G and Andy Eckstein, Esquire, associate general counsel of The Procter & Gamble Company. *See* Stip. at ¶ 7 and Ex. E ("7-10-18 Taitt Ltr."). In the letter, Attorney Taitt references the May 24, 2018 incident at P&G's Pineville plant, and he notes that Air Products' "has expended significant resources in support of P&G's root cause investigation" and will "continue to cooperate with P&G as it evaluates potential causes of the Incident." 7-10-18 Taitt Ltr. at ECF p. 2. Attorney Taitt also discusses Attorney Gralapp's e-mail and points out that Attorney Gralapp did not provide "specific information regarding the nature of the claims he intended to pursue." *Id.* Attorney Taitt then informs P&G that

> [t]he purpose of this letter is provide notice that Air Products may look to P&G to indemnify, defend, and hold harmless Air Products from any and all claims, damages, expenses, losses, costs, or liabilities, including without limitation reasonable legal costs, fees, and expenses (collectively, "Losses") related to or arising out of the Incident. Air Products hereby provides notice to P&G of the threatened claims and reserves all rights to seek reimbursement from P&G for Losses already incurred and to be incurred in the future relating to the Incident.

*Id.* The letter attaches a copy of the Agreement (with a reference in the letter to sections 9(a) and 9(d) of the Agreement), and Attorney Gralapp's July 3, 2018 e-mail. *Id.* at ECF p. 3.

Through a letter dated July 18, 2018 to Attorney Taitt, Attorney Eckstein states in relevant part as follows:

> P&G agrees with Air Products that it is premature at this time given ongoing efforts to identify the root cause or causes of the incident to tender any claims relating to the incident for indemnification. P&G requests that Air Products continue to cooperate and support efforts to identify the root cause or causes of the incident. Also, with reference to the terms of Section 9(d) of the Agreement, P&G hereby provides notice to Air Products that P&G reserves all rights to seek indemnification from Air Products in the future relating to the incident.

Stip. at ¶ 8 and Ex. F ("7-18-18 Eckstein Ltr."). Attorney Eckstein also "ask[ed]" Ms. Taitt to "confirm receipt of this letter and confirm Air Products' agreement that any indemnity determination is premature at this time while the root cause investigation continues." 7-18-18 Eckstein Ltr.

Via a letter dated August 31, 2018, to P&G and Attorney Eckstein, Attorney Taitt clarified Air Products' position by stating that Air Products "hereby tenders the above matter to P&G to indemnify, defend, and hold harmless Air Products pursuant to Sections 9(a) and 9(d) of the [Agreement]." Stip. at ¶ 9 and Ex. G ("8-31-18 Taitt Ltr."). Attorney Taitt further indicates that

> Section 9(a) of the Agreement provides that P&G "assumes all risk and liability for any loss, damage or injury to third persons or property of third persons ... arising out of the presence or use of the Hydrogen and shall indemnify, defendant and hold harmless Air Products from any loss, damage, injury, cost and expense (including reasonable legal fees) related thereto."

> Section 9(d) provides that P&G shall defend, indemnify and hold harmless Air Products "for all claims, damages, expenses, losses, costs or liabilities, including without limitation reasonable legal costs, fees and expenses" arising out of "bodily injuries, including without limitation fatal injury" to P&G employees, among others, "arising from or in connection with the performance of th[e] Agreement."

The Petition for Damages in the above-referenced matter, attached for your reference, makes claims for losses to third parties and P&G employees arising out of the presence or use of Hydrogen (as defined in the Agreement) and/or in connection with Air Products' performance of the Agreement. Such claims fall squarely within Sections 9(a) and/or 9(d).

*Id.* at ECF pp. 2–3. Attorney Tuitt then asks P&G and Attorney Eckstein to "confirm by September 7, 2018, your acceptance of this tender and please advise the name of counsel you will retain to defend Air Products in this matter on your account." *Id.* at ECF p. 3.

Through a September 6, 2018 letter from Erin Casey Hangartner, Esquire, counsel for P&G, to Attorney Tuitt, P&G "respectfully decline[d] the tender of indemnification and defense to Air Products." Stip. at ¶ 10 and Ex. H ("9-6-18 Hangartner Ltr."). Attorney Hangartner also stated as follows:

The demand for indemnity is premature as no payment of damages has been made. Even the request to tender a defense is premature because the facts that may trigger a duty to defend are unknown or disputed, and the root cause analysis has not been completed. Critically, the interpretation of the asserted indemnity clauses is heavily informed by the performance by both P & G and Air Products of their respective legal and contractual duties, and these issues have not yet been addressed.

Accordingly, we are not now convinced Section 9(a) or (d) of the [Agreement] apply to the underlying lawsuit of *Lott v. Plug Power, Inc. et al.*, particularly in the context of the *Perry-Ruzzi* doctrine that requires clear and unequivocal contract language to support an indemnity claim.

We are confident patience is appropriate here. Notably, paragraph 9(d) grants reciprocal rights to P & G, which is currently neither in a position to assert those rights nor to concede the application of paragraph 9(d) in favor of Air Products.

9-16-18 Hangartner Ltr. at ECF pp. 2–3 (internal footnotes omitted).

Through a letter dated September 13, 2018 to Attorney Hangartner, Attorney Taitt indicated that she had, after two telephone conferences, asked P&G to reconsider its position to not tender a defense to Air Products in the underlying state court matter. *See* Stip. at ¶ 11 and Ex. I ("9-13-18 Taitt Ltr."). According to the letter, P&G had reiterated its rejection of Air Products'

tender. *See* 9-13-18 Taitt Ltr. at ECF pp. 3–4. Essentially, Attorney Taitt explained in the letter why P&G was obligated to defend and indemnify Air Products. *See id.* at ECF pp. 2–4. In addition, she requested that P&G refer the matter to a senior manager and that if P&G did not promptly act, Air Products would potentially take legal action to enforce its rights under the Agreement. *See id.* at ECF p. 4.

### C.    <u>Analysis</u>

In the cross-motions for summary judgment, the parties are debating only whether P&G has a duty to defend Air Products in the Lott Matter based on section 9(d) of the Agreement. *See* Pl.'s Mem. at 11 ("[A]t this time Air Products is seeking only to enforce P&G's duty to defend Air Products in the Lott matter, and no claim for indemnity has yet been made in this case."); Def.'s Mem. at 1 (describing sole issue before court as "Whether Section 9(d) of the . . . Agreement . . . requires P&G to defend Air Products against claims based entirely upon Air Products' own acts and failures to act"). As such, the court must determine whether Section 9(d) imposes upon P&G a duty to defend Air Products and, if so, whether the allegations in the Lott Matter "aris[e] from or in connection with the performance of th[e] Agreement" so as to trigger P&G's duty to defend Air Products in the Lott Matter.[9]

Air Products points out that in analyzing whether P&G has a duty to defend it in the Lott Matter, the court must look to the plaintiffs' allegations against it in that case. Pl.'s Mem. at 10–11. It asserts that the duty to defend is broader than the duty to indemnify and, as such, the court must determine whether the claims in the Lott Matter arguably fall within the scope of section 9(d). *Id.* at 11. With these concepts in mind, Air Products contends that P&G has a duty to defend

---

[9] Air Products describes section 9(d) as a "knock for knock" provision "in which each party assumes all risk and liability arising from injury or death to its own employees, or damage to its own property, arising from or in connection with the performance of the Agreement, regardless of fault." Pl.'s Mem. at 4 (citing *Richard v. Anandarko Petroleum Corp.*, 2015 Dist. LEXIS 37232 (W.D. La. Mar. 24, 2015)).

it in the Lott Matter because (1) the underlying claims arise from bodily injuries to P&G employees, and (2) those injuries unambiguously arise from or are connected to Air Products' performance of the Agreement because they relate to the "hydrogen compression, storage and dispensing system" that Air Products selected, installed, and maintained at P&G's Louisiana facility. *Id.* at 11–12.

Concerning this latter point, Air Products points out that its performance under the Agreement included supplying hydrogen to P&G, providing P&G with an "off-the-shelf hydrogen and storage dispensing system," and "***designing and maintaining*** the hydrogen storage and dispensing system to meet P&G's specifications." Pl.'s Br. in Opp'n to Def.'s Cross-Mot. for Summ. J. and in Further Supp. of its Mot. for Summ J. ("Pl.'s Opp'n") at 2, Doc. No. 27; *see also id.* at 3–5. Air Products also notes that the phrase "performance of the Agreement" is not ambiguous even though it is not defined in the Agreement because Air Products' performance, *i.e.* its duties and obligations, are specifically set forth in the Agreement. *Id.* at 5–7. In addition, Air Products contends that it does not matter where its conduct took place, *i.e.* in Louisiana or elsewhere, because the Agreement does not define P&G's duty to defend by the location of Air Products' services, but "by the fact that the underlying claims arise out of acts that Air Products undertook in furtherance of its contractual duties." *Id.* at 9.

Air Products further argues that the *Perry-Ruzzi* rule[10] does not apply to these proceedings to determine whether P&G has a duty to defend because it only relates to claims for

---

[10] Although the parties dispute whether the *Perry-Ruzzi* rule applies in this case (which the court will discuss later in this opinion), they do not dispute the contours of the rule. In this regard, the *Perry-Ruzzi* rule provides that

a contract of indemnity against personal injuries should not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed in unequivocal terms. The liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation.

indemnification. Pl.'s Mem. at 13–14; *see also* Pl.'s Sur-Reply Br. in Opp'n to Def.'s Cross-Mot.

for Summ. J. ("Pl.'s Sur-Reply") at 4, Doc. No. 29 ("It is undisputed that the *Perry-Ruzzi* rule

applies when a party seeks indemnification for its own negligence."). In this regard, Air Products

asserts that the Pennsylvania Supreme Court rejected the notion that *Perry-Ruzzi* would apply to

duty-to-defend claims in *Mace v. Atlantic Refining & Marketing Corp.*, 785 A.2d 491 (2001). Pl.'s

Sur-Reply at 5–6. In addition, any application of *Perry-Ruzzi* to duty-to-defend claims would run

afoul of contract interpretation pertaining to a duty to defend because (1) the duty to defend is

broader than the duty to indemnify and (2) the duty to defend applies to claims that are arguably

or potentially within the scope of the applicable contractual provision. *Id.* at 6–7. At bottom, Air

Products argues that P&G

> improperly conflates the standard for determining whether a duty to defend ***exists***
> with the standard for determining whether a claim is within the ***scope*** of the duty to
> defend. Pennsylvania law, however, holds that a duty to defend must be expressed

---

*Perry v. Payne*, 66 A. 553, 557 (Pa. 1907); *see Ruzzi v. Butler Petroleum Co.*, 588 A.2d 1, 4 (Pa. 1991) ("The law has been well settled in this Commonwealth for 87 years that if parties intend to include within the scope of their indemnity agreement a provision that covers losses due to the indemnitee's own negligence, they must do so in clear and unequivocal language. No inference from words of general import can establish such indemnification."); *see also Greer v. City of Philadelphia*, 795 A.2d 376, 380 (Pa. 2002) ("Unless the language of the contract is clear and unambiguous . . . such that the contract puts it beyond doubt that the parties intended the interpretation that [the party seeking indemnification] advocates, we must opt for the interpretation that does not shoulder [the alleged indemnitor] with the fiscal responsibility for [the indemnitees'] negligence."); *Topp Copy Prods., Inc. v. Singletary*, 626 A.2d 98, 100 (Pa. 1993) ("[W]hen interpreting the validity and enforceability of indemnity clauses [Pennsylvania law does] not recognize as effective an agreement concerning negligent acts unless an express stipulation concerning the indemnitee's negligence was included in the document."). On occasion,

> [t]his policy sometimes requires a reviewing court to disregard the plain meaning of a clause, as
> discussed by . . . *Deskiewicz v. Zenith Radio Corp.*[, 561 A.2d 33, 35 (Pa. Super. 1989)]:

>> A fundamental rule of construction in the law of contracts states that words,
>> phrases and clauses will be given their plain and ordinary expressed meaning. If
>> this is so, then this particular area of law, indemnification for damages or injuries
>> arising from negligent acts, could be thought of as an exception to the general
>> rule. If literal effect was given to these clauses then indemnification would be
>> enforced. Yet due to policy and practical considerations decisions have been
>> handed down indicating that such generally worded indemnification clauses will
>> not be construed to mean that the indemnitor will indemnify the indemnitee for
>> liability resulting from the indemnitee's own negligence.

*Bracken v. Burchick Constr. Co., Inc.*, No. 1432 WDA 2012, 2014 WL 10790110, at *3–4 (Pa. Super. Oct. 10, 2014).

in clear language, but once that is found, the duty is triggered by a claim that is 'potentially' or 'arguably' within the scope of the duty.

*Id.* at 7.

Air Products also argues that even if *Perry-Ruzzi* applied to its claim for a defense by P&G in the Lott Matter, section 9(d) complies with the rule insofar as it clearly and unequivocally requires P&G to defend it in the Lott Matter. Pl.'s Mem. at 13–14. Concerning its argument that *Perry-Ruzzi* only applies to claims for indemnification, Air Products asserts that the Supreme Court of Pennsylvania declined to expand the rule to claims relating to a duty to defend. Pl.'s Reply at 5–6. In addition, the *Perry-Ruzzi* rule requires that "a party must clearly and unequivocally agree to indemnify another party for that party's negligence, and . . . the rule is satisfied by an express agreement that manifests the parties' intent." Pl.'s Opp'n at 13 (citations omitted). Air Products contends that section 9(d) of the Agreement satisfies this standard. *Id.* at 14.

In support of its own motion and in response to Air Products' motion, P&G argues that Pennsylvania and Third Circuit precedent requires the court to closely scrutinize the indemnity/defense language in section 9(d), especially since Air Products drafted the Agreement.[11] Def.'s Mem. at 6. In addition, it contends that the court should construe any ambiguity against Air Products because it is the party seeking indemnification. *Id.* It further asserts that these "general indemnity principles apply regardless of whether the indemnity provisions at issue concern indemnification or a duty to defend, or both." *Id.* at 6, n.4 (citing *Jacobs Constructors, Inc. v. NPS Energy Servs., Inc.*, 264 F.3d 365 (3d Cir. 2001)). Moreover, because Air Products is seeking a

---

[11] The parties did not stipulate that Air Products drafted the Agreement. Nonetheless, P&G asserts that (1) the Agreement is drafted on Air Products' stationary bearing its corporate logo at the top of each page, (2) the Agreement refers to the parties as "Air Products" and "Buyer" throughout, and (3) the Agreement lacks a joint preparation clause. Def.'s Mem. at 6, n.3. Air Products does not acknowledge drafting the Agreement. *See* Pl.'s Opp'n at 13, n.2 ("Air Products does not concede that it is the drafter of the Agreement, and the Stipulation of Material facts does not address this issue.").

defense for its own alleged acts or failures to act, the court must conduct "even *more* exacting" scrutiny of Section 9(d). *Id.* at 7. In this regard, P&G asserts that the *Perry-Ruzzi* rule applies to Air Products' request for a defense in the Lott Matter, as it is not limited to claims for indemnification. *Id.* at 7–8 (citing *Jacobs Constructors*, 264 F.3d at 372 and *Invensys Inc. v. Am. Mfg. Corp.*, No. Civ. A. 04-3744, 2005 WL 600297 (E.D. Pa. Mar. 15, 2005)); *see also* Def.'s Reply in Supp. of its Cross-Mot. for Summ. J. and Sur-Reply in Opp'n to Pl.'s Mot. for Summ J. ("Def.'s Reply") at 2, Doc. No. 28 ("[D]espite Air Products['] attempts to minimize the import of Pennsylvania's long-standing *Perry-Ruzzi* rule, it inarguably applies when an indemnitee seeks defense for its own alleged acts and/or failures to act."). This rule applies even "when construing defense and indemnification obligations at the summary judgment stage." Def.'s Reply at 2 (citation omitted).

P&G argues that it has no duty to defend Air Products under the Agreement because, *inter alia*, it does not clearly and unequivocally oblige P&G to defend and indemnify Air Products from the Louisiana plaintiffs' claims. *Id.* at 9–16. In particular, P&G believes that section 9(d) uses "words of general import," which are insufficient under *Perry-Ruzzi* to create an obligation to defend an indemnitee for its own conduct. *Id.* at 10. P&G also notes that the Louisiana plaintiffs' claims relate to "alleged conduct that occurred before the hydrogen compression, storage and dispensing system had even left Air Products' exclusive possession and control." *Id.* (citations omitted). None of the claims pertain to Air Products' conduct at P&G's Louisiana facility. *Id.* at 11. As such, as the Agreement does not define "performance of the Agreement," (1) it is not clear and unequivocal that claims relating to Air Products' conduct that occurred before any equipment left its possession or control are claims "arising from or in connection with the performance of the Agreement," and (2) there is no indication that the parties intended for indemnification for

"upstream products liability claims." *Id.* at 12. P&G also points out that the Agreement was not a contract for purchase of the equipment as title to the equipment remained with Air Products, or for "the research, development, design, and production of the hydrogen compression, storage and dispensing system." Def.'s Reply at 5–7 and n.3.

P&G also observes that if the parties intended to include a duty to defend and indemnify the other in connection with any incident involving the presence of hydrogen at the Louisiana facility, they could have used similar language to that in section 9(a) of the Agreement, which includes the phrase "arising out of the presence of use of hydrogen." *Id.* at 14. If the parties had used this language, P&G concedes that it would be required to defend and indemnify Air Products in the Lott Matter. *Id.* Accordingly, based on the above, P&G contends that the court must grant its motion for summary judgment and conclude that it has no duty to defend Air Products in the Lott Matter or pay for its defense fees and costs to date.

As resolution of the instant cross-motions requires interpretation of the Agreement, the court will set forth the applicable Pennsylvania law for this contract dispute.[12] In general, "[t]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006) (citations omitted); *see Garden State Tanning, Inc. v. Mitchell Mfg. Grp., Inc.*, 273 F.3d 332, 335 (3d Cir. 2001) ("The paramount goal of contract interpretation is to determine the intent of the parties. Pennsylvania contract law begins with the firmly settled principle that the intent of the parties to a written contract is contained in the writing itself." (internal quotation marks and citation omitted)). When the words of the written

---

[12] This court has subject-matter jurisdiction over this action based on the diversity statute, 28 U.S.C. § 1332. As such, Pennsylvania contract law would apply even if the parties did not have a choice of law provision in the Agreement. *See Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 158 (3d Cir. 2017) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–80 (1938)). Both parties have applied Pennsylvania law to the dispute in this matter.

agreement "are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). "When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." *Ins. Adjustment Bureau*, 905 A.2d at 468 (citations omitted). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal. Corp.*, 519 A.2d 385, 390 (Pa. 1986) (citations omitted). "The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact." *Id.* (citations omitted); *see Kiewit E. Co., Inc. v. L & R Constr. Co., Inc.*, 44 F.3d 1194, 1199 (3d Cir. 1995) ("It is for the court, as a matter of law, to determine whether ambiguity exists in a contract." (citing *Hutchison*, 519 A.2d at 390)). When determining whether an ambiguity "is present in an agreement, a court must not rely on a strained contrivancy to establish one; scarcely an agreement could be conceived that might not be unreasonably contrived into the appearance of ambiguity. Thus, the meaning of language cannot be distorted to establish the ambiguity." *Steuart*, 444 A.2d at 663.

Regarding a duty to defend, this duty

> is separate and distinct from the duty to indemnify. *Jacobs*, [264] F.3d at 376. "The duty to defend is broader than the duty to indemnify, since it applies not only to claims that 'are or reasonably appear to be within the scope of the indemnity obligation but also to claims that arguably are or might be found within that scope.'" *Bowman v. Am. Homecare Supply, LLC*, No. 07-3945, 2008 WL 4787558, at *6 (E.D. Pa. Oct. 30, 2008) (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 650 (3d Cir. 1990)). "'Generally, the duty to defend is triggered if the underlying complaint avers facts that would support indemnification under the agreement, and the indemnitor must defend until such time as the claim is confined

to recover that the contract does not cover.'" *Id.* (quoting *Mace v. Atl. Ref. Mktg. Corp.*, 567 Pa. 71, 785 A.2d 491, 500 (Pa. 2001)).

*Maule v. Philadelphia Media Holdings, LLC*, Civ. A. No. 08-3357, 2010 WL 914926, at *10 (E.D. Pa. Mar. 15, 2010).

> Concerning indemnity agreements,
>
> [t]he construction of an indemnity contract is a question of law for the court to decide. *See Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 201, 519 A.2d 385, 390 (1986). Under Pennsylvania law, the court must strictly construe the scope of an indemnity contract against the party seeking indemnification. *See Brown v. Moore*, 247 F.2d 711, 722 (3d Cir. 1957), *disapproved on other grounds*. As with any other contract, the court must determine the intentions of the parties. *See Metzger v. Clifford Realty Corp.*, 327 Pa. Super. 377, 385, 476 A.2d 1, 4 (1984) (citation omitted). If the indemnity clause is clear and unambiguous, then the intentions of the parties should be ascertained primarily by looking to the language used in the agreement. *See Fallon Elec. Co., Inc. v. The Cincinnati Ins. Co.*, 121 F.3d 125, 127 (3d Cir. 1997). Only where the court finds ambiguity may it consider the circumstances under which the contract was signed. *See East Crossroads Ctr., Inc. v. Mellon-Stuart Co.*, 416 Pa. 229, 230, 205 A.2d 865, 866 (1965). The mere fact that the parties do not agree upon the proper interpretation of an indemnity clause does not necessarily render the clause ambiguous. *See Metzger*, 327 Pa. Super. at 386, 476 A.2d at 4.

*Jacobs Constructors*, 264 F.3d at 371.[13] Also, "indemnity clauses are construed most strictly against the party who drafts them especially when that party is the indemnitee." *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa. Super. 2000).

---

[13] The court notes that the Third Circuit has also set forth the following standard for enforcing an indemnification clause:

> First, the clause must not contravene public policy. Second, the contract must relate solely to the private affairs of the contracting parties and not include a matter of public interest. Third, each party must be a free bargaining agent. In addition, an exculpatory or indemnity clause will still not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence. The clause must be construed strictly and the contract must state the intention of the parties with the greatest particularity. Furthermore, any ambiguity must be construed against the party seeking immunity, and that party also has the burden of proving each of the prerequisites to enforcement.

*Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 (3d Cir. 1995) (citation omitted).

As the parties' arguments demonstrate, they disagree about whether the *Perry-Ruzzi* rule applies to a party's claim relating to a duty to defend. Despite the parties' claims that their respective positions are well-established in the applicable case law, very few cases have addressed similar circumstances and the arguments presented here. There is at least one Third Circuit decision applying the *Perry-Ruzzi* rule while analyzing whether a possible indemnitor owed a duty to defend to a possible indemnitee. *See Jacobs Constructors*, 264 F.3d at 373–74.[14] Following

[14] In *Jacobs Constructors*, various injured parties and decedents' representatives brought an action against a company after a fire and explosion occurred at the company's refinery. 264 F.3d at 367. The company then brought an out-of-state declaratory judgment action against the contractor it hired to perform an addition to the refinery, claiming that the contractor had a contractual duty to defend it against the personal injury claims, some of which were brought by employees of a subcontractor the contractor hired to perform certain mechanical work on the addition. *Id.* at 367–68. In response to the company's out-of-state action against it, the contractor filed an action in the Western District of Pennsylvania seeking a declaratory judgment that the subcontractor, *inter alia*, was contractually obliged to defend it in the out-of-state action by the company. *Id.* at 368. The district court ultimately granted summary judgment in favor of the contractor, finding that the applicable language in the parties' subcontract could apply to a contractual indemnity arising out of a personal injury claim. *Id.* at 370.

While the Third Circuit had to address multiple issues on appeal, the first issue the court addressed was whether the district court erred in concluding that the subcontract imposed an obligation on the subcontractor to defend the contractor in the Texas suit. *Id.* at 370–71. The Third Circuit noted that the subcontractor argued on appeal that the *Perry-Ruzzi* rule should apply to "the indemnification and defense of a party's contractual liability." *Id.* at 371. The subcontractor further asserted that the district court should have analyzed whether the subcontract "expressly *includes*, rather than excludes, such obligations." *Id.* The Third Circuit agreed with the subcontractor. *Id.*

In addressing the subcontractor's duty to defend, the court discussed general indemnity principles, including, *inter alia*, that "the court must strictly construe the scope of an indemnity contract against the party seeking indemnification." *Id.* (citation omitted). The court then indicated that "[i]t is well-settled in Pennsylvania that an indemnity agreement that covers loss due to the indemnitee's own negligence must be clear and unequivocal," and goes on to discuss *Perry* and *Ruzzi*. *Id.* at 371–72. After discussing the *Perry-Ruzzi* rule, the court determined that the "Pennsylvania Supreme Court would hold that [it] applies to indemnity claims for losses contractually assumed by the indemnitee." *Id.* at 372. In doing so, the court explained that

> our position is consistent with the well-established principle in Pennsylvania that an indemnity clause is to be construed against the party seeking indemnification. Indeed, because the nature and purpose of any indemnity agreement involves the shifting and voluntary assumption of legal obligations, they are to be narrowly construed. As a general rule, parties must use clear, unambiguous language to ensure their enforcement. It follows that the enforcement of the duty to indemnify for contractual liability should hinge on the same criteria.

*Id.* at 373.

The Third Circuit then applied the *Perry-Ruzzi* rule to the subcontract and concluded that it did not unequivocally require [the subcontractor] to defend [the contractor] in an indemnification suit brought by a third party." *Id.* The court specifically indicated that it was reading the applicable indemnification and defense provision "narrowly," *id.* at 373, and concluded that "[the subcontractor's] duty to defend [the contractor] in contractual indemnity suits may arise only from the plainly expressed intention of the parties, spelled out in unambiguous terms." *Id.* at 374. Since the subcontract lacked such "specific language," the court held that "the subcontractor was not obligated to defend [the contractor] against contractual indemnity claims." *Id.*

*Jacobs Constructors*, at least two district courts and one Pennsylvania Court of Common Pleas have at least referenced that the *Perry-Ruzzi* rule—that the parties must use clear and unambiguous language for indemnification—applies to contractual provisions providing a purported duty to defend. *See Invensys Inc. v. Am. Mfg. Corp.*, No. Civ. A. 04-3744, 2005 WL 600297, at *4 (E.D. Pa. Mar. 15, 2005) ("As indemnity clauses are construed against the party seeking indemnification, a duty to defend will only be found where the parties used clear, unambiguous language."); *see also Citizens for Pa.'s Future v. Pittsburgh Water and Sewer Auth.*, Civ. A. No. 12-943, 2013 WL 2556857, at *5 (W.D. Pa. June 10, 2013) ("Thus, because indemnity clauses are construed against the party seeking indemnification, 'a duty to defend will only be found where the parties used clear unambiguous language.'" (quoting *Invensys Inc.,* 2005 WL 600297, at *4)); *Thyssen Elevator Corp. v. Humford Equities*, 15 Pa. D. & C.5th 422, 427–28 (Luzerne Cty. Ct. Com. Pl. 2010) (applying *Perry-Ruzzi* to parties' dispute over duty to defend language in agreement, after indicating that "counsel for the parties agree [that *Perry-Ruzzi*] is both applicable and controlling," and concluding that duty to defend language in parties' agreement is "both clear, unambiguous and specific").[15]

The Supreme Court of Pennsylvania seemingly determined that the *Perry-Ruzzi* rule does not apply to duty-to-defend claims in *Mace v. Atlantic Refining Marketing Corp.*, 785 A.2d 491 (2001). In *Mace*, a franchise agreement and real estate lease required the franchisee to "indemnify and defend [the franchisor] from all personal injury lawsuits arising out of [the franchisee's] operation of the [franchise] store, unless the injury was caused solely by the negligence of [the franchisor]." 785 A.2d at 492–93. An individual who was severely beaten with an aluminum bat

---

[15] In *Ivensys*, the court ultimately concluded that the parties' asset purchase agreement did not require the defendant to affirmatively defend the plaintiff because the indemnity clause gave "Defendant a choice between reimbursing an indemnitee for the attorneys' fees and costs that party incurred in defending a lawsuit, or defending the suit itself." 2005 WL 600297, at *5 (citation omitted).

by an employee of the franchisee in the store's parking lot sued the employee assailant, the franchisee, and the franchisor, claiming that (1) the assailant committed the torts of assault and battery, (2) the franchisee (a) was vicariously liable as the assailant's employer, (b) had failed to provide a safe facility, and (c) had negligently hired, supervised, and trained the assailant, and (3) the franchisor was liable as the franchisor of the store and it had failed to properly supervise the franchise's operations. *Id.* at 493–94. The franchisor filed a cross-claim against the franchisee for contractual indemnity and breach of contract, asserting that the franchise agreement and lease obligated the franchisee to defend the franchisor against the victim's claims. *Id.* at 494.

The trial court granted the franchisor's motion for summary judgment and dismissed all claims against it (including cross-claims). *Id.* Although the franchisor continued prosecuting its cross-claims against the franchisee for defense costs and legal fees that it expended in defending itself in the underlying action, the trial court eventually dismissed the franchisor's cross-claims after concluding that the franchise agreement and lease did not oblige the franchisee to defend the franchisor in the personal injury action. *Id.* The franchisor appealed to the Superior Court, which affirmed the dismissal after applying the *Perry-Ruzzi* rule. *Id.* One judge on the panel dissented "taking the position that the *Perry-Ruzzi* rule was not applicable to the instant case because [the franchisor] was not attempting to recover for its own negligence." *Id.*

On appeal to the Pennsylvania Supreme Court, the franchisor asserted that *Perry-Ruzzi* did not apply and "when basic contract principles are applied to the Agreement and Lease, it is clear that [the franchisee] is responsible for paying the costs that [the franchisor] incurred in defending itself from the personal injury suit." *Id.* The Court agreed. *Id.*

The Court explained that the *Perry-Ruzzi* rule "is reserved only for instances where a party seeks indemnification for its own negligence." *Id.* at 495. The rule was therefore inapplicable to

this case because the franchisor "[wa]s not seeking to relieve itself of responsibility for its own negligence." *Id.* Instead, the franchisor

> was merely *charged* with negligence based on the actions of [one of the franchisee's employees.] . . . [The franchisor] was loosed of all tort responsibility in the underlying case when the trial court granted [its] motions for summary judgment, thereby dismissing with prejudice all claims and cross-claims against [it]. Since [the franchisor] was adjudicated a non-negligent party, the *Perry-Ruzzi* rule is, by definition, not relevant here.

*Id.* (internal quotation marks and citation omitted).

In reaching this conclusion, the Court specifically rejected the franchisee's invitation to expand the *Perry-Ruzzi* rule

> to become an overarching principle that is applied every time a potential indemnitee, such as [the franchisor] in this case, is charged with negligence. . . . [W]henever an indemnitee is charged with negligence, the indemnification agreement must pass muster under the *Perry-Ruzzi* rule regardless of whether the indemnitee is actually found to be negligent. . . . [S]uch a rule would allow litigants to determine from the outset of a claim the nature and extent of their indemnification and defense obligations and their expectations for record of indemnification and defense costs.

*Id.* (internal footnote omitted). The Court further explained that "expanding the *Perry-Ruzzi* rule to encompass situations where a party is merely alleged to have been negligent would render indemnification meaningless, as even a completely frivolous negligence action filed against an indemnitee would automatically eradicate an otherwise valid indemnification provision." *Id.* at 496.

The Court then applied "general principles of contract interpretation to determine whether [the franchisee] had an obligation under the Agreement and Lease to defend [the franchisor] from the personal injury lawsuit." *Id.* Applying these principles, the Court determined that the franchise agreement and lease required the franchisee to defend the franchisor in the personal injury action

and, as the franchisee failed to do this, the franchisor could recover the costs expended in defending the lawsuit. *Id.* at 496–97.

Recognizing that the facts of *Mace* are not analogous to those here, at a minimum there is a plausible argument that after *Mace* the *Perry-Ruzzi* rule does not apply to whether there is a duty to defend arising from an indemnification provision in an agreement.[16] Unfortunately, the Third Circuit decided *Jacobs Constructors* prior to the Pennsylvania Supreme Court's decision in *Mace*, so the Third Circuit did not have the opportunity to address its impact on the subcontractor's contractual duty to defend in that case. This court has not located another decision addressing the

---

[16] In *Mace*, Justice Cappy, in a dissenting opinion, appeared to recognize the implications of the majority's holding on whether the *Perry-Ruzzi* rule would apply to duty to defend claims moving forward. Justice Cappy indicated that "the majority essentially finds that the *Perry-Ruzzi* rule of construction is only applicable to cases where the would-be indemnitee has actually been adjudicated negligent." 785 A.2d at 498 (Cappy, J., dissenting). He explained that it was his view that due to the language of the provisions of the franchise agreement and lease at issue, "the applicability of *Perry-Ruzzi* should depend upon the **allegations** in the underlying lawsuit, for that is the time when the obligation to defend arises." *Id.* (citation omitted). He further explained that

> the concerns that animated the *Perry-Ruzzi* rule—*i.e.*, that provisions that purport to afford a party protection from claims premised upon its own negligence are so 'unusual and extraordinary' that they should be found to exist only when the contract expressly requires it—exist the moment the would-be indemnitee is 'merely alleged' to have been negligent, for that is when the indemnitor's obligation is triggered.
>
> . . . Th[e] duty of defense, when it exists, obviously is triggered before any determination is made as to ultimate fault in the underlying action. For it is upon the mere allegation that legal consequences—to wit, the costs of defense that are at issue here—begin to arise. It is that duty of defense for which [the franchisor] now seeks compensation. Indeed, but for the Plaintiff's allegation that [the franchisor] was negligent, [it] would have no claim at all against [the franchisee. The franchisor] cannot have it both ways. . . .
>
> As a result of the majority's decision, claims for defense costs will sometimes be treated differently than indemnification costs for purposes of the *Perry-Ruzzi* rule. While these liabilities are distinct, the *Perry-Ruzzi* rule should apply to claims for both types of costs. In this case, the two provisions at issue are entitled "Indemnity and Insurance" and under that heading, the parties intentionally encompassed both indemnification and defense costs. Additionally, defense costs in many instances can be just as burdensome as indemnification costs; this court should be wary of presuming that the indemnitor intended to assume the responsibility for the costs of defending against claims alleging the indemnitee's own negligence without an express agreement.

*Id.* at 498–99 (citation omitted).

The Court also notes that Justice Saylor wrote a dissenting opinion in which he indicated that *Perry-Ruzzi* would not "come into play in assessing an indemnitor's duty to defend in situations in which the plaintiff's 'sole negligence' theory is merely one of multiple claims asserted against the prospective indemnitee." *Id.* at 500 (Saylor, J., dissenting).

effect of *Mace* on the *Perry-Ruzzi* rule relating to a duty to defend claim in the indemnification context.[17] Nonetheless, it is this court's view that *Mace* holds that the rule only applies to situation where a party is seeking indemnification for its own negligence.

Upon thoroughly reviewing the parties' submissions, the applicable law, and the Agreement, the court finds that section 9(d) of the Agreement clearly and unequivocally provides that, under the circumstances presented here, P&G has a duty to defend Air Products based upon Air Products' negligence or strict liability if the action involves claims for bodily injuries to P&G employees.[18] This section specifically describes that the indemnitor's "OBLIGATION TO INDEMNIFY, DEFEND AND HOLD HARMLESS SHALL APPLY WITHOUT REGARD TO FAULT OR CAUSE OF THE LOSS, INCLUDING WITHOUT LIMITATION THE NEGLIGENCE OR STRICT LIABILITY OF THE INDEMNITEE." Agreement at § 9(d). This language is more than sufficient to manifest the parties' intent to indemnify for the negligence of the indemnitee. As Air Products points out, Pennsylvania courts have found somewhat similar language to be sufficiently clear and unambiguous to indicate the parties' agreement to indemnify the indemnitee for its own negligent acts. *See* Pl.'s Mem. at 14–15 (citing *Bethlehem Steel Corp. v. Matx, Inc.*, 703 A.2d 39 (Pa. Super. 1997) (enforcing provision whereby contractor would indemnify plaintiff "from an against all loss or liability for or on account of any injury (including death) or damages received or sustained by the Contractor or any of its subcontractors or any

---

[17] The court notes that in *Bowman v. American Homecare Supply, LLC*, Civ. A. No. 07-3945, 2008 WL 4787558 (E.D. Pa. Oct. 30, 2008), the court had to resolve a dispute over the interpretation of an indemnification clause in the parties' stock purchase agreement. *Id.* at *1. The clause contained language pertaining to the plaintiffs' duty to defend and indemnify the defendant. *Id.* In analyzing the parties' claims concerning the indemnification clause, the court pointed out that "[u]nder Pennsylvania law, courts must strictly construe the scope of an indemnity agreement against the party seeking indemnification." *Id.* at *6. When the court discussed whether the plaintiffs had a duty to defend, the court did not mention the *Perry-Ruzzi* rule; yet, referenced it when discussing the duty to indemnify (albeit ultimately determining that the rule did not apply because the defendant was not seeking indemnification for its own negligence). *Id.* at *6, 8.

[18] P&G would have had the same right had Air Products' employees been injured and sued P&G.

employee, agent or invitee of the Contractor or any of its subcontractors by reason of any act or omission, whether negligent or otherwise, on the part of any of the Bethlehem Companies or any employee, agent or invitee thereof or the condition of the Site or other property of any of the Bethlehem Companies or otherwise"); *Morgan v. Harnischfeger Corp.*, 791 A.2d 1273 (Pa. Commw. 2002) (enforcing indemnification provision which provided contractor would indemnify Pennsylvania Turnpike Commission for injuries to "all persons, whether employees of [the contractor] or otherwise . . . whether or not . . . claims are based upon the alleged active or passive negligence or participation in the wrong of the Commission, its Commissioners, agents, servants, and/or employees . . . or upon any alleged breach of any statutory duty or obligation on the part of the Commission[.]"); *Hoffman v. ARCO Mgmt. of Wash., D.C., Inc.*, No. 04-187, 2005 U.S. Dist. LEXIS 2241 (W.D. Pa. Feb. 9, 2005) (concluding that provision required subcontractor to defend and indemnify management company where it stated that subcontractor would indemnify, defend, and hold harmless management company from claims for loss or injury "caused by the negligence or fault of the [management company] in failing to provide a safe work space")); *see also* Def.'s Mem. at 16 (asserting that in *Bethlehem Steel*, *Morgan*, and *Hoffman*, "the issue was ***whether the relevant indemnity provisions contained adequate indication of an agreement to indemnify the indemnitee for its own negligent acts*** and whether the indemnification language was sufficient to overcome the indemnitor's immunity under the Workmen's Compensation Act" (emphasis added)).

In addition, the court finds that at least one of the underlying claims in the Lott Matter at least potentially or arguably fits within the scope of P&G's duty to defend.[19] In this regard, the

---

[19] In this regard, the court's decision here would be same regardless of whether *Perry-Ruzzi* applies because the duty to defend is expressed in unequivocal terms in the Agreement. The court does not find that words of general import are being used here as the duty to defend is clear and unambiguous and Air Products' performance under the Agreement can be ascertained by the Agreement itself.

court finds that the language "arising from or in connection with the performance of this Agreement" is unambiguous.[20] As Air Products argues, the Agreement clearly sets forth Air Products' "performance" under the Agreement, which included supplying hydrogen and the equipment used to store and dispense the hydrogen at P&G's facility.[21] It also required that Air Products design, maintain, and install the equipment it deemed appropriate at the P&G facility. Agreement at § 3(a), (c) and Attachment 2 at §§ 2–3, 5. The Lott Matter includes claims pertaining

As an aside, if *Perry-Ruzzi* applies, there is at least the potential for inconsistency based upon the current state of Pennsylvania law on duty to defend claims in the non-insurance context, especially based on how P&G would have the court apply *Perry-Ruzzi*. In the insurance context, the law is abundantly clear that the duty to indemnify, while not as broad as the duty to defend, is not subject to a more searching review than when a court is deciding whether an insurer has a duty to defend. Instead, the applicable standard is dependent on the stage of the case, with the duty to defend being implicated upon a review of the underlying complaint and the duty to indemnify (while being triggered upon a review of the complaint) not being implicated until there is a determination of coverage. *See Erie Ins. Exchange v. Fidler*, 808 A.2d 587, 590 (Pa. Super. 2002) ("The obligation of an insurer to defend an action against the insured is fixed solely by the allegations in the underlying complaint. As long as a complaint alleges an injury which may be within the scope of the policy, the insurer must defend its insured until the claim is confined to a recovery the policy does not cover."); *State Farm Fire and Cas. Co. v. DeCoster*, 67 A.3d 40, 46 (Pa. Super. 2013) ("Unlike the duty to defend, a determination of the duty to indemnify is not necessarily limited to the factual allegations of the underlying complaint. Rather, there must be a determination that the insurer's policy *actually* covers a claimed incident." (citation and internal quotation marks omitted)). In the non-insurance context, claims for indemnification are (understandably) subjected to a very highly scrutinized review pursuant to the general caselaw and *Perry-Ruzzi*, yet in these same cases, courts still mention that the duty to defend is broader than the duty to indemnify. Thus, if the *Perry-Ruzzi* rule applies to both the duty to defend and duty to indemnify in the non-insurance indemnification context, and if the rule applies beyond identifying whether there is a duty to defend generally and applies to the scope of that duty, it would appear that the principle that the duty to defend is broader than the duty to indemnify would no longer exist.

[20] The court disagrees with P&G that *Hershey Foods Corp. v. General Electric Service Co.*, 619 A.2d 285 (Pa. Super. 1992) warrants a different result here. The indemnity provision in that case provided that General Electric would indemnify Hershey "against all [personal injury or property damage] claims, damages, losses and expenses including attorneys' fees *arising out of or resulting from the performance of the 'Work*,'" 619 A.2d at 286–87. Also, the agreement defined "Work," as "the performance of electrical work throughout the plant as required by the engineering departments." *Id.* at 287. The Superior Court found that "[t]he contract of the parties unambiguously provides for indemnification even were the indemnitee was negligent." *Id.* at 288 (citations omitted). The court then stated that the contract did not include the conduct of an employee who was injured during his lunch break because it did not fit in within the definition of "performance of the Work." *Id.* at 290. Because the contract language was ambiguous, the court interpreted it against Hershey as the drafter of the agreement and concluded that Hershey was not entitled to indemnification from General Electric. *Id.*

Here, P&G has not pointed to any requirement that the Agreement had to define the phrase "performance of the Agreement," as the parties did in *Hershey* for the court to find that the phrase is unambiguous. The Superior Court did not state that the phrase must be defined to be enforceable. In addition, unlike here, the personal injury claims arose out of conduct by the employee that clearly were not within the scope of the work described under the agreement. Again, here, Air Products had to, *inter alia*, select the equipment, design and install it, and maintain it at P&G's Louisiana location. The claims in the Lott Matter, as they pertain to Air Products, arise out of or relate to its work pursuant to the Agreement.

[21] Per general principles related to contract interpretation, the court can give words and phrases their plain meaning without the parties having specifically defined "performance of this Agreement" in the Agreement.

to the design of the equipment used at the P&G facility, and while the court understands P&G's argument that "design" in this context could pertain to Air Products' actions prior to any equipment reaching P&G's Louisiana facility, the petition in the Louisiana action does not specify the manner in which the equipment was designed deficiently or contained insufficient warnings, and these claims could potentially be related to any actions Air Products took when designing the equipment for meeting P&G's specifications for use at the Louisiana site.[22]

Further, at a minimum, the Louisiana plaintiffs allege that Air Products maintained the hydrogen compression, storage and dispensing system and was negligent in failing to properly maintain it, *see* Pet. for Damages at ¶¶ 34, 173(d), and part of its performance under the Agreement clearly involved maintaining the equipment for the system.[23] *See* Agreement at § 3(c), (d). As such, the Lott Matter includes allegations that would arguably support indemnification or defense under the Agreement, so P&G, as the indemnitor, must defend Air Products in the Lott Matter until the point in the litigation where the Louisiana plaintiffs possibly only had pending claims that the Agreement would not cover. *See Gen. Acc. Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997) ("If the complaint against the insured avers facts that would support a recovery covered by the policy, then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy does not cover.").

---

[22] The Agreement clearly and unambiguously provides for defense and indemnification for claims arising from the indemnitee's strict liability. These types of claims include manufacturing defects, design defects, and the failure to warn. All those claims could arise from equipment manufactured, selected, installed, and designed as part of the hydrogen compression, storage and dispensing system Air Products set up at the Louisiana facility.

[23] On this point, P&G is incorrect that "[t]he claims at issue against Air Products are based exclusively upon alleged conduct that occurred before the hydrogen compression, storage and dispensing system had even left Air Products' exclusive possession and control." Def.'s Mem. at 10. At a minimum, the claims also reference Air Products' failure to adequately maintain the system, which Air Products was contracted to do for P&G as part of the Agreement.

### III.    CONCLUSION

For the reasons set forth above, section 9(d) of the Agreement clearly and unambiguously imposes an obligation upon P&G to defend Air Products for, *inter alia*, claims for bodily injuries by P&G employees caused by the negligence or strict liability of Air Products. It appears that under Pennsylvania law following *Mace*, a contractual provision in the non-insurance context that includes an indemnification provision that contains a duty to defend is to be interpreted by general contact principles (including those relevant to indemnification claims). In addition, the court does not find the language "arising from or in connection with the performance of this Agreement" to be ambiguous simply because the Agreement does not define it; the scope of Air Products' "performance" under the Agreement is specifically set forth therein. Moreover, the facts and claims alleged by the Louisiana plaintiffs arise from or are in connection with Air Products' performance under the Agreement, which included, *inter alia*, selecting, designing, installing, and maintaining a hydrogen compression, storage and dispensing system for P&G's use at its Louisiana facility. Therefore, the Louisiana plaintiffs' claims at least arguably fall within the scope of P&G's duty to defend Air Products as provided for in the Agreement.

Accordingly, the court will grant Air Products' motion for summary judgment and deny P&G's cross-motion for summary judgment. The Agreement provides that Air Products is entitled to recover its reasonable legal costs, fees and expenses that it has incurred in defending the Louisiana action to date. The court will provide Air Products with 14 days to file a statement of these costs and expenses and the same period thereafter for P&G to respond to the extent that it believes that any claimed cost or expense is unreasonable.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.